## NORFOLK & W. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.   March 4, 1910.)

### No. 944.

1. RAILROADS (§ 254*)—OPERATION—SAFETY APPLIANCE ACT—PENALTIES.

The duties imposed on railroad companies to equip their cars with safety appliances by the safety appliance act of Congress (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], as amended by Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1143]) are absolute duties, and relief from the penalty for noncompliance cannot be obtained by showing reasonable care and want of intentional violation of the act.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 765, 766; Dec. Dig. § 254.*

Duties of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

2. RAILROADS (§ 229*)—OPERATION—SAFETY APPLIANCE ACT—CONSTRUCTION.

The safety appliance act, requiring cars used in interstate commerce to be so equipped as to couple automatically by impact without the necessity of men going between the ends of the cars, requires that the device itself must be in such repair as to be capable of operation; and hence an instruction that the possibility of uncoupling by crawling under the car, or by climbing over it, or by going around the end of the train, does not prevent the existence of a "necessity" within the statute of men going between the ends of the cars in order to uncouple, and, if the uncoupling lever at either end of any car is so inoperative that it is necessary in order to uncouple to go between the cars to go around the car, or crawl under it, then the car is in such a condition of disrepair that it is unlawful to use it in the movement of interstate commerce, was not erroneous, where the proof showed that the coupling apparatus of the freight car in question was out of repair and inoperative.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

3. RAILROADS (§ 229*)—OPERATION—SAFETY APPLIANCE ACT—CONSTRUCTION—GRAB IRONS.

The safety appliance act (Act March 2, 1893, c. 196, § 4, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], as amended by Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1143]), requiring the equipment of all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce with grab irons, is applicable to passenger as well as freight cars.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

4. COMMERCE (§ 27*)—SUBJECTS OF REGULATION—RAILROADS—SAFETY APPLIANCES.

Where a train is composed of cars, some of which are, and some of which are not, engaged in interstate traffic, the whole train is subject to the safety appliance act, and it is immaterial whether the car not properly equipped is coupled to a car containing interstate commerce or not in order to establish a liability on the railroad company.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*]

5. TRIAL (§ 235*)—INSTRUCTIONS—WEIGHT OF EVIDENCE.

Where, in an action by the United States to recover a penalty against an interstate railroad company for failure to comply with the safety appliance act, the government inspectors testified to discovering the defects

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes·

alleged, while the railroad company's inspector testified that he inspected the cars in question, and did not discover the defect, instructions that the testimony of the railroad company's inspectors could only be considered in so far as it tended to contradict the testimony of the government inspectors, and as tending to contradict the government's evidence on that point, were erroneous, as declaring the evidence solely contradictory in character and as tending to give undue weight to evidence of the government's inspectors, and also because the evidence of the railroad company's inspector was positive, and not negative.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 539; Dec. Dig. § 235.*]

Cross-Writ of Error to the District Court of the United States for the Western District of Virginia, at Lynchburg.

Action by the United States of America against the Norfolk & Western Railway Company. Judgment for plaintiff, and defendant brings error, and plaintiff sues out a cross-writ of error. Plaintiff's writ dismissed, and judgment reversed on defendant's writ.

This was an action of debt brought by the United States to recover penalties authorized by the safety appliance act. The declaration contained nine counts. Upon trial in the court below the plaintiff abandoned its claim to recover under the second count and dismissed it. Of the remaining counts, the first charged the railroad company with operating its freight car 21158 in interstate commerce with coupling apparatus out of repair and inoperative, contrary to section 2 of the original act as amended by section 1 of the act of March 2, 1903. The second, third, fourth, fifth, and sixth counts charge the hauling by the company in a train containing interstate traffic its passenger cars numbered 512, 527, 547, and 524, respectively, without the same being equipped with the grab irons or handholds required by section 4 of the act as so amended. The seventh and ninth counts charge the hauling in a train wherein was a car engaged in interstate traffic, a Pullman parlor car, "Blanche," and a Pullman parlor car, "Margaret," respectively, unequipped with such grab irons. The eighth count charges the company with hauling its passenger car 533 at the time engaged in interstate traffic without such equipment. Demurrer to the declaration and each count thereof was entered, overruled, and exception taken. The defendant plead the general issue and filed a specification of grounds of defense. The plaintiff filed 149 interrogatories, which, on motion of the defendant, were stricken out, to which action the plaintiff excepted. A trial resulted in a verdict and judgment for $800 for the plaintiff. Seventeen bills of exceptions were saved to defendant to the rulings of the court in admitting certain testimony and rejecting certain other, the giving of certain instructions, the refusal to give certain others, to the overruling of the demurrer and of motions to direct verdict for defendant, to set aside the verdict and grant a new trial, and to the rendering of judgment. The defendant has sued out this writ of error, and the plaintiff has sued out a cross-writ of error, assigning as basis therefor the action of the court in striking out the interrogatories filed by it and the refusal to require the production of certain documentary evidence.

Theodore W. Reath and Roy B. Smith (Robertson, Smith & Wingfield, on the brief), for Norfolk & W. Ry. Co.

Thomas L. Moore, U. S. Atty., and Phillip J. Doherty, Special Asst. U. S. Atty. (Wade H. Ellis, Assistant to the Atty. Gen., and Samuel H. Hoge, Asst. U. S. Atty., on the brief).

Before GOFF and PRITCHARD, Circuit Judges, and DAYTON, District Judge.

DAYTON, District Judge (after stating the facts as above). Neither in brief nor oral argument has the cross-writ of error sued out by the United States been discussed by counsel. It may be assumed to have been abandoned, but, whether this be true or not, an examination of the record and the alleged errors assigned by it has fully convinced us that its grounds are without merit and it will be dismissed. Counsel for both sides in oral argument and in the very able briefs filed by them have reduced the errors assigned to five propositions.

First. Should the demurrer to the declaration have been sustained because it did not charge the appliance to be defective because of negligence and want of care on the part of the company?

· Second. Did instruction No. 2 given by the court for the plaintiff in effect require of the defendant different appliances than those required by the safety appliance act?

Third. Does section 4 of the act, requiring grab irons, apply to passenger cars?

Fourth. Does this act reach or can it apply to cars containing domestic commerce not connected with or coupled to cars containing interstate commerce?

Fifth. Was it error to give instructions Nos. 4, 5, and 7 for the plaintiff, to the effect that the evidence of the company's inspector was negative, while that of the government's inspectors was positive, in character?

We will consider these questions in the order set forth. That the duties imposed upon railroad companies to equip their cars with the safety appliances required by these acts is an absolute one and relief from the penalty for noncompliance cannot be obtained by showing reasonable care and want of intentional violation we regard as fully determined by this court in Atlantic Coast Line R. Co. v. United States, 94 C. C. A. 35, 168 Fed. 175. Nothing need be, if indeed anything can be, added here to re-enforce the logic of that decision. It may be stated that in our judgment this ruling has been fully sustained and upheld in such cases as St. Louis, Iron Mt. R. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; Southern Ry. Co. v. Carson, 194 U. S. 136, 24 Sup. Ct. 609, 48 L. Ed. 907; U. S. v. Colo. & N. W. R. Co., 85 C. C. A. (Eighth Circuit) 27, 157 Fed. 321, 15 L. R. A. (N. S.) 167; U. S. v. Atchison, T. & S. F. Ry. Co., 90 C. C. A. (Eighth Circuit) 327, 163 Fed. 517; U. S. v. Denver & R. G. Ry. Co., 90 C. C. A. (Eighth Circuit) 329, 163 Fed. 519; Chicago, M. & St. P. Ry. Co. v. U. S., 91 C. C. A. (Eighth Circuit) 373, 165 Fed. 423, 20 L. R. A. (N. S.) 473; Chicago, B. & Q. Ry. v. U. S., 95 C. C. A. (Eighth Circuit) 642, 170 Fed. 556; Chicago Junction Ry. Co. v. King, 94 C. C. A. (Seventh Circuit) 652, 169 Fed. 372; Wabash R. Co. v. U. S., 97 C. C. A. (Seventh Circuit) 284, 172 Fed. 864; Donegan v. Balto. & N. Y. Ry. Co., 91 C. C. A. (Second Circuit) 555, 165 Fed. 869; U. S. v. Southern Ry. Co. (D. C. S. D. Ill.) 135 Fed. 122; U. S. v. Phila. & R. Ry. Co. (D. C. E. D. Pa.) 160 Fed. 696; U. S. v. Wheeling & L. E. Ry. Co. (D. C. N. D. Ohio) 167 Fed. 198; U. S. v. Southern Ry. Co. (D. C. W. D. N. C.) 170 Fed. 1014.

In view of this great weight of authority with which we are in full accord and against which stands alone, so far as we can discover, the two opinions of the Circuit Court of Appeals for the Sixth Circuit in St. Louis & S. F. R. Co. v. Delk, 86 C. C. A. 95, 158 Fed. 931, and United States v. Illinois Central R. R. Co., 170 Fed. 542, 95 C. C. A. 628, we do not deem it incumbent upon us to certify the question to the Supreme Court as suggested by counsel, and especially so as that court has awarded a writ of certiorari in the Delk Case. We hold, therefore, that the court below did not err in overruling the demurrer to the declaration.

Did instruction No. 2 in effect require of the company different appliances than those required by the act? This instruction, which related especially to the freight car 21158 whose coupling appliance was charged in the first count to be defective, was:

"(2) In the second section of the statute it is provided as follows: ' * * * It shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.' The court instructs you that passing from one side of a train to the other by going over the couplers between the ends of the cars is 'going between the ends of the cars' within the meaning of the statute. The court also instructs you that the word 'necessity' as used in the second section of the statute does not mean absolute necessity, and also does not imply a physical impossibility of uncoupling except by going between the ends of the cars. *The possibility of uncoupling by crawling under a car, or climbing over a car, or by going around the end of a train, does not prevent the existence of a 'necessity' within the meaning of the statute of men going between the ends of the cars in order to uncouple. If the uncoupling lever at either end of any car is so inoperative that it is necessary in order to uncouple to go between the cars, or to go around the train, or to climb over a car, or crawl under a car, or to climb over or crawl under the couplers, then such car is in such condition of disrepair that it is unlawful to use it in the movement of interstate traffic.*"

That part of the instruction italicized is the part objected to, and it is insisted that, in effect, it charged the jury that an appliance must be furnished with a lever on both sides of each end of every car, thus requiring an appliance not designated by the act. It is suggested that it might be true that the coupling lever on one side could not be worked but the one on the other side could, and a perfectly safe way existed at the time for the brakeman to go across the top or platform of the car to use the other lever to work the same coupling, and that under such circumstances the company would have furnished exactly what the act requires, namely, an automatic coupler which could be operated by one of the levers without the necessity for men going between the ends of the cars. And yet it is insisted, under this instruction, such evidence would result in a fine for an offense purely imaginary, not designated or within the letter or spirit of the law. The four cases of Morris v. Duluth, S. S. & A. Ry. Co., 47 C. C. A. 661, 108 Fed. 747, Gilbert v. Burlington, C. R. & N. Ry. Co., 63 C. C. A. 27, 128 Fed. 529, Suttle v. Choctaw, O. & G. R. Co., 75 C. C. A. 470, 144 Fed. 668, and Union Pac. R. Co. v. Brady, 88 C. C. A. 579, 161 Fed. 719, are cited to show that it is negligence to go between the ends of cars merely because the coupling could not be worked by one of the levers if the coupling could

have been operated by the other on the far side of the car from the brakeman. It is to be noted that these four cases, all decided by the Circuit Court of Appeals for the Eighth Circuit, were cases wherein brakemen were seeking to recover for negligence on account of inoperative coupling appliance on their sides of the cars which led them to go between the cars to pull the coupling pins when operative levers to pull these pins existed on the opposite sides of the cars. It is also to be noted that this same court in five cases hereinbefore cited has held in construing the safety appliance acts the duty of railroad companies to equip all their cars with the required safety appliances is an absolute one, not permitting the defense of reasonable care and lack of intentional violation. Its position is set forth in this matter in the Gilbert Case, where it is held that the safety appliance act making it the absolute duty of the companies to equip their cars with couplers which can be uncoupled "without the necessity of men going between the ends of the cars" imposes upon the employés the correlative duty of using these couplers when furnished, and of refraining from unnecessarily going between the ends of cars to uncouple them, and a failure of a servant to observe this duty directly contributes to his injury and bars his recovery.

But, returning to the crucial question involved here, it is necessary for us to observe carefully the language of the act. It does not specify any particular coupling device to be used except to the extent that it shall couple automatically by impact, and which can be uncoupled without the "necessity of men going between the ends of the cars." It does not determine how many levers shall be furnished to operate a coupling device, nor where such levers shall be placed. If one be sufficient in connection with the device to perform the work of operation, but one is required. On the other hand, there is no restriction upon the placing of two such levers, one on each side, on the end of any or all its cars, if the companies desire or deem it conducive of more effective operation of the coupling automatically by impact without the necessity of men going between the ends of the cars. But, while this is true, these levers, whether one or more, become parts of the coupling device itself, and we think a fair construction of the statute requires us to hold that the device itself must be in such repair as to be capable of operation, and if the levers furnished to operate it, whether one or two at the end of the car, should, as such parts of it, be kept in condition to operate it; that, if there be two, one on each side of the end of a car, and one be maintained in a condition capable of operation and the other not, the latter is calculated only to deceive the employé and under some conditions perhaps create a necessity, in other conditions at least a temptation, to be negligent and step between the cars to uncouple them by hand. The defective lever has no business there and should be either made operative or taken away, as it renders, in the true sense of the statute, the coupling device, of which it is a part, defective.

In the language of Van Devanter, Judge, in U. S. v. Denver & R. G. Co., 90 C. C. A. 329, 163 Fed. 519:

"We cannot assent to the contention which is founded upon it, namely, that an inoperative coupler—that is, one which cannot be properly manipulated preparatory to effecting a coupling or an uncoupling, as the case may be, without

a man going between the ends of the cars—is yet to be regarded as conforming to the statute, because another coupler (we would say also the same coupler by means of a different lever) capable of being so manipulated can be coupled therewith and uncoupled therefrom without a man going between the cars if he submits to whatever of inconvenience or risk may be incident to getting at the lever of the operative coupler (or as we would add of the operative lever of the coupler)."

We admit that, when a word like "necessity" is used in a statute, it is very difficult and generally inexpedient by a general instruction to a jury to attempt to define by specific illustrations its scope which will depend largely upon circumstances, but we do not think the giving of this instruction, under the circumstances and evidence adduced in this case, involved substantial error.

As regards the third proposition involved here, whether section 4 of the act requiring grab irons is applicable to passenger cars, counsel on both sides have presented exhaustive and interesting reviews of the history of this legislation to aid us in determining the intent of Congress in this particular. We do not deem it necessary to discuss the question from this view point. It is admitted that the amendment of March 2, 1903, was declaratory of the original act. By its provisions the grab irons were required to be attached to "all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce," except to four-wheel cars, and cars and locomotives exclusively used in transportation of logs, exempted by section 6 of the original act. The Supreme Court in Johnson v. Southern Pac. Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, held the word "car" used in sections 2, 6, and 8 of the original act to have been used in its generic sense intended to include "all kinds of cars running on the rails," and that it did include a locomotive which could not couple automatically with a dining car. Section 6, so construed, expressly prescribed a penalty for the use of "any car in violation of any of the provisions" of the act, of course including section 4—the grab iron section —which by the amended and declaratory act of March, 1903, was to apply to "all cars and similar vehicles used on any railroad engaged in interstate commerce." The Johnson Case has been cited and approved since in Schlemmer v. Buffalo & Rochester, etc., Ry., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681. The contention that these cases not having under specific consideration this particular section 4 do not apply here, and leaves the question of its application to passenger cars, we think untenable. Nor do we think it can be successfully contended, as sought to be done by the fourth proposition, that the act does not apply to a car containing only domestic commerce, although hauled in a train with other cars containing interstate commerce unless it be coupled to a car containing interstate commerce. The overwhelming weight of authority is against such contention. As well said in U. S. v. Erie R. R. Co. (D. C.) 166 Fed. 352:

"A train composed of cars, some of which are and some of which are not engaged in interstate traffic, is subject to the regulation of Congress. A railway company cannot escape liability by mixing in the same train cars engaged in interstate traffic with cars engaged in intrastate traffic. All the cars in such a train must be provided with the automatic couplers and grab irons required by the act of March 2, 1893, for every such car is in fact 'used in moving interstate traffic.'"

See, also, Schlemmer v. Buffalo & Rochester, etc., Ry., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681; Wabash R. Co. v. United States, 93 C. C. A. 393, 168 Fed. 1; Chicago, M. & St. P. Ry. Co. v. United States, 91 C. C. A. 373, 165 Fed. 423, 20 L. R. A. (N. S.) 473; Chicago & N. W. Ry. Co. v. United States, 93 C. C. A. 450, 168 Fed. 236, 21 L. R. A. (N. S.) 690; United States v. Southern Ry. Co. (D. C.) 170 Fed. 1014; United States v. Balto. & O. Ry. Co. (D. C.) 170 Fed. 456.

Finally, did the court below err, to the prejudice of the defendant, by giving, at the instance of the plaintiff, instructions 4, 5, and 7? These instructions were as follows:

"(4) The court instructs the jury that they can consider the evidence offered by the defendants relating to inspection of the alleged defective car, N. & W. 21158, at Bristol only in so far as it tends to contradict the testimony of the plaintiff's witnesses upon the point as to whether or not the defect as alleged in the declaration did really exist at the time that the said car left Roanoke, Va.

"(5) The fact that the defendant's witness testified that an inspection of N. & W. car 21158 was made at Bristol and that the alleged defect set out in the declaration was not discovered by him can only be considered as tending to contradict the evidence of the government's witness on that point, and its weight is for the jury."

"(7) The court instructs the jury that in passing upon the question of the conflict in the evidence of the government inspectors, and the inspector of the defendant railroad company at Bristol who testified to having inspected car N. & W. 21158, they must consider that one is positive testimony and the other is negative. The inspectors of the government testify that they inspected the coupling and saw that it was defective. Therefore the correctness of their testimony depends only on the fact whether or not they swore to the truth; while, on the other hand, in considering the testimony of the inspector of the railroad, there are two things to be taken into consideration: First, did he testify to the truth when he stated that he did not discover the defect in the coupling; second, if he did swear the truth when he so stated, then did he, in examining the train in the limited time in which he claimed to have inspected it, make such close and accurate inspection as to be able to give persuasive evidence in contradiction of the testimony of the government inspectors."

These instructions told the jury that the evidence of the inspector of the company, whose express duty it was to inspect all cars coming into his yard at Bristol with a view to discover and report these very defects in safety appliances, and who has testified that in discharge of that express duty he did inspect this particular car 21158 and found no defect in its coupling device, could only be considered "in so far as it tends to contradict" the testimony of the government inspectors; that such evidence could only "be considered as tending to contradict the evidence of the government on that point" (that is, whether defect in the coupling device existed or not); and that such evidence was negative as to the inspection, while that given by the government inspectors was positive. We think there is error in these instructions, and that they should not have been given for these reasons: First, because they held the evidence to be solely contradictory in character; second, because they tended to give undue weight to the evidence of the government inspectors; and, third, because the evidence of the company's inspector was not negative but positive. We think the District Court for the Western District of Ohio in United States v. Balto. & Ohio R. R. Co. (not reported, but published by the Interstate Commerce Commis-

sion in pamphlet form), Judge Cochran, charging the jury in a similar case, has rightly held:

"In considering the testimony of witnesses the jury should not give either more or less weight to the testimony of any witness because of the fact that such witness testifies on behalf of the government, or on behalf of the railroad company, but the jury should give to the testimony of each witness that weight which in its judgment it is entitled to from all the facts and circumstances in the case."

The District Court for the Northern District of Illinois in Atchison, T. & S. F. Ry. Co. (not reported, but published by the Interstate Commerce Commission) has reiterated and approved this proposition. The evidence of the company's inspector was not negative. It is to be remembered that he was employed by the company for the express purpose of inspecting cars and discovering and reporting these and other defects; that he has testified that in discharge of this express duty he inspected this train and this particular car in question; that he lifted all the rods or levers to see if they were in condition from one end of the train to the other, always in accord with a fixed practice of his inspection; and that he found no defect in the coupling device in question. This was positive evidence of a negative fact.

In 17 Cyc. 802, it is well said:

"The marked superiority of positive testimony is most commonly affirmed in those cases where the opposing testimony is what has been hereinbefore denominated 'strictly negative.' If there is evidence that the attention of a negative witness was specially directed to the fact, or it can be legitimately presumed or inferred that he was alert and would have observed had the fact occurred his testimony that he did not see or hear is not necessarily weaker than opposing positive and affirmative testimony, and may indeed be entitled to more weight than the latter. Where witnesses testify positively to a fact and other witnesses absolutely deny it, the rule of comparative value as between positive and negative testimony does not apply, and the only question is to which side, under all the circumstances, credit is due."

And a large number of authorities are there cited.

In a case directly in point, the District Court of the United States for the Western District of Pennsylvania (United States v. Baltimore & Ohio R. Co., 170 Fed. 456) held:

"Positive testimony is to be preferred to negative testimony, other things being equal; but where it was the duty of an inspector on the part of the railroad company to inspect cars, and he says that he did inspect the cars that came in and did not see certain defective appliances, that is not such negative testimony that it should not receive the same consideration, other things being equal between the witnesses, as positive testimony."

See, also, Denver & R. G. R. Co. v. Lorentzen, 24 C. C. A. 592, 79 Fed. 291.

For this error in giving these instructions the judgment of the court must be reversed, and the cause remanded, with instructions to set aside the verdict and grant a new trial.

Reversed.